IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| INNOVA HOSPITAL SAN ANTONIO,) <br> L.P., ) <br> ) <br>     Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> HUMANA INSURANCE COMPANY ) <br> and HUMANA HEALTH PLAN OF ) <br> TEXAS, INC., ) <br> ) <br>     Defendants. ) <br> _____ ) | CV. NO. 5:13-CV-1089-DAE |

<u>ORDER DENYING MOTION TO REMAND TO STATE COURT</u>

On June 9, 2014, the Court heard argument on a Motion to Remand filed by Plaintiff Innova Hospital San Antonio, L.P. ("Plaintiff").  (Dkt. # 6.) Mason Meyer, Esq., appeared at the hearing on behalf of Plaintiff; Richard G. Foster, Esq., appeared on behalf of Defendants Humana Insurance Company and Humana Health Plan of Texas, Inc. (collectively, "Defendants").  After careful consideration of the arguments at the hearing as well as the supporting and opposing memoranda, the Court **DENIES** Plaintiff's Motion.

## BACKGROUND[1]

I.   Factual Background

Defendants Humana Insurance Company and Humana Health Plan of Texas operate as a Basic Health Maintenance Organization ("HMO").  (Pet. ¶ 16.) In order to meet Defendants' obligations to provide healthcare benefits and services to their insured members residing in Texas and to derive the benefit of receiving a twenty-percent discount on healthcare services, Defendants entered into a Subscriber Services Agreement with a Preferred Provider Organization ("PPO"), named Three Rivers Provider Network ("Three Rivers").  (Id. ¶ 20.)

Plaintiff Innova Hospital is a healthcare provider located in San Antonio, Texas.  (Id. at 1.)  In 2007, Plaintiff became a "Preferred Provider" with Three Rivers by entering into a "Preferred Provider Agreement."  (Id. ¶ 18; see also id., Ex. A at 5–6.)  Pursuant to the Preferred Provider Agreement with Three Rivers, Plaintiff agreed to provide treatment and services to certain covered individuals at discounted rates.  (Id. ¶ 19; see also id., Ex. A at 5.)

On September 6, 2013, Plaintiff filed a lawsuit against Defendants, alleging that after rendering healthcare services for four patients that were insured by Defendants, Plaintiff's claims were not satisfactorily paid by Defendants.  Each

---

[1] The following background facts are drawn from Plaintiff's state-court Petition. (See "Pet.," Dkt. #1-4.)

of Plaintiff's claims relating to each of the four patients will be discussed in detail.

    A.   <u>Patient #1</u>

       From April 10, 2012 through April 13, 2012, Patient #1, an insured member of Defendants, was admitted to Plaintiff's Hospital for treatment.  (<u>Id.</u> ¶ 23.)  Before treatment, Patient #1 signed an irrevocable assignment to Plaintiff, conveying of all title and interest in all claims, causes of action, and benefits Patient #1 was entitled to receive from Defendants.  (<u>Id.</u>)  Also before treatment, Plaintiff telephoned Defendants for verification of Patient #1's coverage and precertification of specific medical or surgical services.  (<u>Id.</u> ¶ 25.)  Plaintiff's Hospital Verification Clerk gave Defendants' agent a detailed description of the operative procedures and CPT codes for all treatment Patient #1's doctors deemed medically necessary.  (<u>Id.</u>)  According to Plaintiff, Defendants' agent approved three days of In-Patient hospitalization for authorized procedures to be performed while Patient #1 was in the hospital.  (<u>Id.</u>)

       On April 26, 2012, Plaintiff submitted its claim for the hospitalization, care, and treatment of Patient #1 to Defendants, for total charges of $572,326.51.  (<u>Id.</u> ¶ 27.)  On June 28, 2012, Defendants made a $239,999.47 payment, which Plaintiff alleges was underpaid by not less than $42,871.38.  (<u>Id.</u> ¶ 31.)  Plaintiff also asserted that Defendants' payment was a late payment, in violation of Texas Insurance Code §§ 843.3385 and 1301.1054(b).  (<u>Id.</u> ¶¶ 30–31.)

Plaintiff subsequently appealed the alleged underpayment.  (Id. ¶ 33.) On December 5, 2012, Defendants made an additional $80,503.37 payment on Plaintiff's claim for treating Patient #1.  (Id. ¶ 34.)  Plaintiff alleged, however, that even after crediting the $80,503.37 payment, Defendants still owed an additional $66,300.43 because of the statutory late-payment penalties.   (Id. ¶¶ 35–36.) Nevertheless, sometime after Defendants submitted the $80,503.37 payment, Defendants began sending letters to Plaintiff, averring that the $80,503.37 was an overpayment.  (Id. ¶ 37.)

Plaintiff then filed the instant suit, seeking: (1) late payment penalties and interest owing on the claim for treating Patient #1, (2) attorney's fees, and (3) a declaratory judgment that it did not owe a refund to Defendants for the treatment of Patient #1.  (Id. ¶¶ 39–40.)

B.   Patient #2

From April 25, 2012 to May 3, 2012, Patient #2, an insured member of Defendants, was admitted to Plaintiff's Hospital for treatment.  (Id. ¶ 41.) Before treatment, Patient #2 also signed an irrevocable assignment to Plaintiff, conveying of all title and interest in all claims, causes of action, and benefits Patient #2 was entitled to receive from Defendants.  (Id.)  Plaintiff telephoned Defendants for verification of Patient #2's coverage and precertification of medical or surgical services before treating Patient #2.  (Id. ¶ 43.)  Plaintiff's Hospital

4

Verification Clerk gave Defendants' agent a detailed description of the operative procedures and CPT codes for all treatment Patient #2's doctors deemed medically necessary.  (Id.)  According to Plaintiff, Defendants' agent approved Patient #2's hospitalization for authorized procedures to be performed while Patient #2 was in the Hospital.  (Id.)

On May 18, 2012, Plaintiff submitted its claim to Defendants totaling $395,791.26 for treatment provided to Patient #2.  (Id. ¶ 45.)  On June 14, 2012, Defendants paid $66,369.39 to Plaintiff.  (Id. ¶ 46.)  Plaintiff asserted that this payment was an underpayment by not less than $237,515.46.  (Id. ¶ 48.)  Plaintiff also contended that Defendants owed an additional $200,000 for a late payment penalty pursuant to Texas Insurance Code §§ 843.342 and 1301.137.  (Id.)  Plaintiff appealed Defendants' $66,369.39 payment and Defendants disputed Plaintiff's claim, arguing that it had made an overpayment to Plaintiff.  (Id. ¶¶ 49–50.)

Plaintiff now includes its claim for services rendered to Patient #2 in the instant litigation, seeking: (1) to recover $481,109.98 for the underpayment amount (which includes the past due balance, late payment penalties, and interest), (2) attorney's fees, and (3) a declaratory judgment that it did not owe a refund to Defendants for the treatment of Patient #2.  (Id. ¶¶ 48, 51–53.)

C.     Patient #3

From January 3, 2012 to January 15, 2012, Patient #3, an insured member of Defendants, presented to Plaintiff's Hospital for treatment.  (Id. ¶¶ 54–55.)  Patient #3 also signed an irrevocable assignment to Plaintiff, conveying of all title and interest in all claims, causes of action, and benefits Patient #3 was entitled to receive from Defendants.  (Id.)  Plaintiff telephoned Defendants for verification of Patient #3's coverage and precertification of medical or surgical services before treating Patient #3.  (Id. ¶ 56.)  Plaintiff's Hospital Verification Clerk gave Defendants' agent a detailed description of the operative procedures and CPT codes for all treatment Patient #3's doctors deemed medically necessary.  (Id.)  According to Plaintiff, Defendants' agent approved Patient #3's hospitalization for authorized procedures.  (Id.)

On January 24, 2012, Plaintiff submitted its claim for care provided to Patient #3 to Defendants for a total amount of $1,436,438.27.  (Id. ¶ 58.)  On March 20, 2012, Defendant paid $522,361.54 to Plaintiff, which Plaintiff claimed was $320,232.40 less than the amount it was entitled to receive.  (Id. ¶ 59.)  On April 20, 2012, Plaintiff appealed Defendants' alleged underpayment and Defendants made a second payment to Plaintiff in the amount of $79,856.00.  (Id. ¶ 60.)  Plaintiff filed a second appeal on November 7, 2012, and as a result, Defendants made an additional $212,786.70 payment.  (Id. ¶ 61.)  Subsequently,

6

Defendants informed Plaintiffs that the additional payment was an overpayment. (Id. ¶ 62.)

Plaintiff now includes its claim for services rendered to Patient #3 in the instant litigation, seeking: (1) late payment penalties and interest owing on the claim for treating Patient #3, (2) attorney's fees, and (3) a declaratory judgment that it did not owe a refund to Defendants for the treatment of Patient #3.  (Id. ¶¶ 64–65.)

D.    Patient #4

From December 2, 2012 to December 5, 2012, Patient #4, an insured member of Defendants, presented to Plaintiff's Hospital for treatment.  (Id. ¶¶ 66–67.)  Patient #4 also signed an irrevocable assignment to Plaintiff, conveying of all title and interest in all claims, causes of action, and benefits Patient #4 was entitled to receive from Defendants.  (Id. ¶ 66.)  Plaintiff telephoned Defendants for verification of Patient #4's coverage and precertification of medical or surgical services before treating Patient #4.  (Id. ¶ 68.)  Plaintiff's Hospital Verification Clerk gave Defendants' agent a detailed description of the operative procedures and CPT codes for all treatment Patient #4's doctors deemed medically necessary. (Id.)  According to Plaintiff, Defendants' agent approved Patient #4's hospitalization for authorized procedures.  (Id.)

On December 14, 2014, Plaintiff submitted its claim for care provided

7

to Patient #4 to Defendants for a total amount of $189,306.61.  (Id. ¶ 70.)  On February 3, 2013, Defendants made a $105,871.70 payment.  (Id. ¶ 71.)  Plaintiff claimed that this payment was $26,642.93 less than it was entitled to receive and subsequently appealed Defendants' payment.  (Id. ¶¶ 71, 74.)  Defendants did not respond to Plaintiff's appeal.

As such, Plaintiff now includes its claim for services rendered to Patient #4 in the instant litigation, seeking: (1) late payment penalties and interest owing on the claim for treating Patient #4, (2) attorney's fees, and (3) a declaratory judgment that it did not owe a refund to Defendants for the treatment of Patient #4. (Id. ¶¶ 79–80.)

II.   Procedural History

On September 6, 2013, Plaintiff filed its state-court Petition in the 73rd Judicial District Court of Bexar County.  Plaintiff's Petition first asserted causes of action for declaratory judgment that it did not owe Defendants for any alleged overpayment.  (Id. ¶¶ 81–82.)  The Petition also asserted several claims for breach of contract, including that Defendants' conduct constituted material breaches of:

1.   The Preferred Provider Agreement between Plaintiff and Three Rivers

2.   The Subscriber Services Agreement between Defendants and Three Rivers

3.      The polices of insurance and/or health plans which covered the patients, which Plaintiff has standing to sue for, by reason of the irrevocable assignments which each of the patients made to Plaintiff before or at the time the patients were begin admitted to Plaintiff's Hospital.

4.      All the related agreements and documents evidencing the relationships and authorizations given and existing among Three Rivers and Defendants.

(Id. ¶ 93.)  The Petition stated claims for promissory estoppel based on Defendants' promises "both directly and through its agent" to pay Plaintiff promptly and in accordance with the Preferred Provider Agreement.  (Id. ¶ 96.) The Petition maintained an action for quantum meruit based on Plaintiff providing medical services to Defendants' insured members.  (Id. ¶ 98.)  Finally, the Petition sought attorney's fees.

On December 2, 2013, Defendant removed the action to this Court. (Dkt. # 1.)  Shortly thereafter on December 30, 2013, Plaintiff filed the instant Motion to Remand.  ("Mot.," Dkt. # 6.)  On January 21, 2014, Defendants filed their Response.  ("Resp.," Dkt. # 10.)

DISCUSSION

I.      Removal Jurisdiction and Complete Preemption

On a motion to remand, the defendant, as the removing party, bears the burden of overcoming the initial presumption against jurisdiction and establishing that removal is proper.  Howery v. Allstate Ins. Co., 243 F.3d 912, 916

9

(5th Cir. 2001).  The removal statute, 28 U.S.C. § 1441(a), is "subject to strict construction because a defendant's use of that statute deprives a state court of a case properly before it and thereby implicates important federalism concerns." Frank v. Bear Stearns & Co., 128 F.3d 919, 922 (5th Cir. 1997).  "[D]oubts regarding whether removal jurisdiction is proper should be resolved against federal jurisdiction."  Acuna v. Brown & Root Inc., 200 F.3d 335, 339 (5th Cir. 2000).

A defendant may remove a civil action if a federal court would have had original jurisdiction over at least one claim.  28 U.S.C. § 1441(a); Giles v. NYLCare Health Plans, 172 F.3d 332, 337 (5th Cir. 1999); De Aguilar v. Boeing Co., 47 F.3d 1404, 1408 (5th Cir. 1995).  Under the removal statute, 28 U.S.C. § 1441(a), "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant" to federal court.  28 U.S.C. § 1441(a).  One category of cases of which district courts have original jurisdiction is "federal question" cases—that is, cases "arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.

Determining whether a particular case "arises under federal law" turns upon the "well-pleaded complaint" rule.  Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. 1, 9–10 (1983).  This rule provides that "federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint."  Caterpillar Inc. v. Williams,

482 U.S. 386, 392 (1987).  In other words, "[t]he rule makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law."  Id.  The existence of a federal defense normally is insufficient to create a case "arising under federal law."  Louisville & Nashville R. Co. v. Mottley, 211 U.S. 149, 154 (1908).

However, there is an exception to the "well-pleaded complaint" rule: complete preemption.  See Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 64–65 (1987).  "[I]f a federal cause of action completely pre-empts a state cause of action[,] any complaint that comes within the scope of the federal cause of action necessarily 'arises under' federal law."  Franchise Tax Bd., 463 U.S. at 24.  "Removal is proper even for state-law causes of action under the complete preemption theory because "[w]hen the federal statute completely pre-empts the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law."  Beneficial Nat. Bank v. Anderson, 539 U.S. 1, 8 (2003).

In enacting the Employee Retirement Income Security Act of 1974 ("ERISA"), Congress created a comprehensive civil-enforcement scheme for employee welfare benefit plans that completely preempts any state-law cause of action that "duplicates, supplements, or supplants" an ERISA remedy.  Aetna Health Inc. v. Davila, 542 U.S. 200, 209 (2004).  Complete preemption under

ERISA derives from ERISA's civil-enforcement provision, § 502(a), which has such "extraordinary" preemptive power that it "converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." Metropolitan Life, 481 U.S. at 65–66. Consequently, any "cause[ ] of action within the scope of the civil enforcement provisions of § 502(a) [is] removable to federal court." Id. at 66.

The Supreme Court's discussion of complete preemption under ERISA's § 502 in Davila is instructive. There, the Court stressed that the "purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans," because "Congress enacted ERISA to 'protect . . . the interests of participants in employee benefit plans and their beneficiaries' by setting out substantive regulatory requirements for employee benefit plans and to 'provid[e] for appropriate remedies, sanctions, and ready access to the Federal courts.'" Davila, 542 U.S. at 208 (quoting 29 U.S.C. § 1001(b)).

The Court reminded that "ERISA's 'comprehensive legislative scheme' includes 'an integrated system of procedures for enforcement.'" Id. (quoting Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 147 (1985)). The primary enforcement procedure under § 502(a) is "a distinctive feature of ERISA" and is "essential to accomplish Congress' purpose of creating a comprehensive statute for the regulation of employee benefit plans." Id. Without this section, "the

12

federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA." Id. (quoting Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 54 (1987)).

Therefore, the Court concluded, "any state-law cause of action that duplicates, supplements, or supplants" the ERISA civil enforcement remedy in § 502(a) necessarily "conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." Id. at 209. If the state-law cause of action is preempted by ERISA's § 502(a), the action is thereby removable to federal court because that state-law claim is effectively transformed into a new federal claim. Id.; see also Westfall v. Bevan, 3:08-CV-0996-D, 2009 WL 111577, at *3 (N.D. Tex. Jan. 15, 2009) ("Because they are recast as federal claims, state-law claims that are completely preempted provide a basis for removal." (internal quotation marks and citations omitted)).

The Court then set forth the following inquiry to determine whether a state-law claim is completely preempted under § 502(a):

> [I]f an individual brings suit complaining of a denial of coverage for medical care, where the individual is entitled to such coverage only because of the terms of an ERISA-regulated employee benefit plan, and where no legal duty (state or federal) independent of ERISA or the plan terms is violated, then the suit falls within the scope of ERISA § 502(a)(1)(B). In other words, if an individual, at some point in time, could have brought his claim under ERISA § 502(a)(1)(B), and where there is no other independent legal duty that is implicated by a defendant's actions, then the individual's cause of action is

completely pre-empted by ERISA § 502(a)(1)(B).

Id. at 210.

The Davila test thus involves two inquiries for complete preemption under ERISA: (A) whether the plaintiff could have brought its claim under § 502(a); and (B) whether no other legal duty supports the plaintiff's claim.

A.    Could Plaintiff have brought its claims under § 502(a)?

1.    Are the plans ERISA-employee-welfare-benefit plans?

To determine whether Plaintiff could have brought its claims under § 502(a), the plans at issue for the four patients must be ERISA-employee-welfare-benefit plans.  "[W]hen there is no genuine dispute regarding ERISA's applicability, courts need not perform an in-depth analysis . . . , but can recognize that ERISA applies to the relevant plan." Meyers v. Tex. Health Res., 3:09-CV-1402-D, 2009 WL 3756323, at *3 (N.D. Tex. Nov. 9, 2009).  Defendants advance—and Plaintiff does not dispute—that the relevant employee-benefit plans at issue are regulated by ERISA.  (See Resp., Ex. B-1 at 1, G-1 at 4.)  Given Plaintiff's lack of objection, the Court concludes that the relevant plans are ERISA-employee-welfare-benefit plans.

2.    Does Plaintiff have standing?

Next, Plaintiff could only have "brought its claim under § 502(a)" if it had standing to assert such a claim under § 502(a).  Plaintiff argues that it is not a

"participant, beneficiary, or fiduciary" of an ERISA plan, and therefore could not

bring its claims under § 502(a).  (Mot. at 4, 6.)  Plaintiff is correct that "a

healthcare provider lacks independent standing to sue under § 502(a)(1)(B)"

because "[b]y its terms, standing under ERISA is limited to participants and

beneficiaries."  Spring E.R., LLC v. Aetna Life Ins. Co., No. H-09-2001, 2010 WL

598748, at *2 (S.D. Tex. Feb. 17, 2010).[2]

      In Marin General Hospital v. Modesto & Empire Traction Co., the

Ninth Circuit held that a plaintiff-hospital lacked standing because it could not

have brought its state-law claims under § 502(a).   581 F.3d 941, 947–48 (9th Cir.

2009).  The hospital lacked standing because the hospital's state-law claims did not

complain about the denial of coverage promised under the patient's ERISA plans,

which § 502(a) seeks to recover.  Rather, the court clarified, the hospital's

complaint only relied on California state law to allege breach of an implied

---

[2] A "participant" includes

> any employee or former employee of an employer, or any member or
> former member of an employee organization, who is or may become
> eligible to receive a benefit of any type from an employee benefit plan
> which covers employees of such employer or members of such
> organization, or whose beneficiaries may be eligible to receive any
> such benefit.

29 U.S.C. § 1002(7).  A "beneficiary is 'a person designated by a participant, or by
the terms of an employee benefit plan, who is or may become entitled to a benefit
thereunder.'"  Id. § 1002(8).

contract, breach of an oral contract, negligent misrepresentation, quantum meruit, and estoppel—each claim arising out of a telephone conversation wherein the defendant insurance company allegedly promised to pay ninety percent of the patient's hospital charges.  Id. at 947.  The court summarized,

> The Hospital does not contend that it is owed this additional amount because it is owed under the patient's ERISA plan.  Quite the opposite. . . .The Hospital is contending that this additional amount is owed based on its alleged oral contract with MBAMD.
>
> [T]he Hospital is not suing defendants based on any assignment from the patient of his rights under his ERISA plan pursuant to § 502(a)(1)(B); rather, it is suing in its own right pursuant to an independent obligation.

Id. at 947–48.

Conversely, a healthcare provider wishing to challenge an insurance company's coverage (i.e., challenging an ERISA benefits determination) has derivative standing if a participant or beneficiary has assigned to it the right of the participant or beneficiary to benefits under the plan.  Quality Infusion Care Inc. v. Humana Health Plan of Tex, Inc., 290 F. App'x 671, 679 (5th Cir. 2008) (concluding that the plaintiffs could have brought their Texas state law claim under § 502(a) because "[i]t is well established that a healthcare provider, though not a statutorily designated ERISA beneficiary, may obtain standing to sue derivatively to enforce an ERISA plan beneficiary's claim"); accord Ambulatory Infusion Therapy Specialists, Inc. v. Aetna Life Ins. Co., Civil Action No. H-05-4389, 2006

WL 1663752, at *7 (S.D. Tex. June 13, 2006) ("[A] health care provider has

standing to sue under § 502(a) as an assignee of a participant or beneficiary in

order to claim plan benefits." (citing Hermann Hosp. v. MEBA Med. & Ben. Plan,

845 F.2d 1286, 1289 (5th Cir. 1999))).

        In this case, neither party specifically addressed whether Plaintiff's

claims are asserted on behalf of the patients to challenge Defendants' lack of

coverage or if they emanated from a separate obligation.[3]  However, the Court has

independently undertaken a thorough analysis of each of Plaintiff's causes of

action outlined in its state-court Petition.

        Plaintiff's claims for promissory estoppel do indeed arise from an

independent, alleged oral contract between Plaintiff's Hospital through its

Verification Clerk and Defendants' agent, wherein the agent pre-authorized

services for each of the four patients.  (See Pet. ¶¶ 25–26 (Patient #1), 43–44

(Patient #2), 56–57 (Patient #3), 68–69 (Patient #4), 95–96 (Promissory Estoppel)).

Under Marin, Plaintiff is unable to bring these claims under § 502(a) because the

claims do not seek additional compensation based on the patient's ERISA plan.

Plaintiff's promissory estoppel claims do not arise in the capacity as an assignee of

an ERISA plan participant or beneficiary under § 502(a).  Rather, Plaintiff's claims

_____

[3] Neither party referenced any of the specific claims in Plaintiff's Petition; instead,
both parties only generally referred to Plaintiff's claims.

stem from an alleged oral contract between Plaintiff's Hospital through its

Verification Clerk and Defendants' agent.  See Marin, 581 F.3d at 948 (holding

that because "the asserted obligation to make the additional payment stems from

the alleged oral contract between the Hospital and MBAMD," "the obligation to

pay this additional money does not stem from the ERISA plan, and the Hospital is

therefore not suing as the assignee of an ERISA plan participant"); see also Conn.

State Dental Ass'n v. Anthem Health Plans, Inc., 591 F.3d 1337, 1347 (11th Cir.

2009) ("[A] healthcare provider's claims of negligent misrepresentation and

estoppel based on a plan's oral misrepresentations are not ERISA claims because

they do not arise from the plan or its terms.").

   However, one of Plaintiff's breach-of-contract claims does attempt to

enforce the terms of an ERISA Plan pursuant to its assignee-status.  First, as noted

above, Plaintiff's Petition sets forth that it required each of the four patients to sign

irrevocable assignments of their interests in their respective ERISA benefits.  (See

Pet. ¶¶ 23, 41, 54, 66; see also id. ¶ 23 n.3.)  Thus, the four patients' assignments

conferred derivative standing on Plaintiff to sue on their behalf to enforce their

ERISA benefits.  See Tango Transp. v. Healthcare Fin. Servs. LLC, 322 F.3d 888,

891 (5th Cir. 2003) (recognizing derivative standing which "permits suits in the

context of ERISA-governed employee welfare benefit plans").  Second, the

Petition asserts breach-of-contract actions based on the patients' ERISA rights:

Defendants Humana Health Plan of Texas, Inc. and/or Humana Insurance Company unjustifiably failed to pay the contracted rates/agreed upon rates in a timely manner in violation of the above cited provisions of the Texas Prompt Payment Statute (i.e., which are set forth in the Texas Insurance Code) and <u>in material breach of</u>:

> ➢ The Preferred Provider Agreement between the Hospital and Three Rivers Provider Network, Inc.;

> ➢ The Subscriber Services Agreement(s) among Humana Health Plan of Texas, Inc., Humana Insurance Company, and Three Rivers Provider Network, Inc. (i.e., under which the Hospital was a third party beneficiary)

> ➢ <u>The policies of insurance and/or health plans which covered the patients made to the Hospital before or at the time the patients were being admitted to the Hospital</u>; and

> ➢ All the related agreements and documents evidencing the relationships and authorizations given and existing among the PPO (i.e., Three Rivers Provider Network, Inc.) and Defendants Humana Health Plan of Texas, Inc., Humana Insurance Company (as Clients of Three Rivers Provider Network, Inc.)

(<u>Id.</u> ¶ 92 (emphases added).)  The Petition then repeats:

The above described conduct of Humana Health Plan of Texas, Inc. and Humana Insurance Company constitutes <u>material breaches of</u>:

> ➢ The Preferred Provider Agreement between the Hospital and Three Rivers Provider Network, Inc.;

> ➢ The Subscriber Services Agreement(s) among Humana Health Plan of Texas, Inc., Humana Insurance Company, and Three Rivers Provider Network, Inc. (i.e., under which the Hospital was a third party beneficiary)

> ➢ <u>The policies of insurance and/or health plans which covered the patients made to the Hospital before or at the time the patients were being admitted to the Hospital</u>; and

19

> ➢ All the related agreements and documents evidencing the
> relationships and authorizations given and existing among
> the PPO (i.e., Three Rivers Provider Network, Inc.) and
> Defendants Humana Health Plan of Texas, Inc., Humana
> Insurance Company (as Clients of Three Rivers Provider
> Network, Inc.)

(Id. ¶ 93 (emphases added).)  As the Petition clearly outlines, Plaintiff is using its

assignee-status to assert breach-of-contract claims on behalf of the patients to

enforce the patients' benefits under their ERISA health plans.  Therefore, Plaintiff

could have brought these breach-of-contract claims under § 502(a).  See Conn.

State Dental Ass'n, 591 F.3d at 1347 ("Claims for [ERISA plan] benefits by

healthcare providers pursuant to an assignment are thus within the scope of

§ 502(a).").

     Consequently, the first prong of the Davila test is satisfied because the

plans at issue are ERISA-regulated plans and at least some of Plaintiff's claims

could have been brought under § 502(a).

    B.    Is there an independent legal duty?

     The second question in the Davila test examines whether Defendants'

actions implicate a legal duty which is entirely independent of ERISA.  Somewhat

similar to the standing inquiry discussed above, this question asks whether a

plaintiff is in fact suing under obligations created by the ERISA plan itself, or

under obligations independent of the plan and the plan member.  See Lone Star

OB/GYN Associates v. Aetna Health Inc., 579 F.3d 525, 529 n.3 (5th Cir. 2009) (holding that the overarching "crucial question" for a complete preemption analysis "is whether [a plaintiff is] in fact seeking benefits under the terms of the plan, or rights that derive from the independent basis of the contract").

In effect, the standing analysis above answers this question. While Plaintiff does assert claims based on the Preferred Provider Agreement and Subscriber Services Agreement, thereby raising independent legal duties, its claims stray from the boundaries of the Agreements into ERISA territory by asserting breach-of-contract actions for violations of the patients' ERISA benefits. (See Pet. ¶¶ 92–93 (alleging material breaches of "[t]he policies of insurance and/or the health plans which covered the patients").) As a result, portions of their claims "arise solely under ERISA or ERISA plans and not from any independent legal duty." Conn. State Dental Ass'n, 591 F.3d at 1353.

Nevertheless, the Court writes separately to address Plaintiff's arguments that—irrespective of paragraphs 92 and 93 of its Petition—its claims are exclusively based on a separate legal duty arising from the Agreements. Plaintiff asserts that its state-law claims exclusively rely on an independent legal duty "arising out of a contract between the parties and independent from obligations under any ERISA plan." (Mot. at 7.) Relying on the Fifth Circuit's Lone Star decision, Plaintiff contends that because it is challenging the "amount" or "rate of

21

payment" Defendants paid (or failed to pay) pursuant to the Preferred Provider Agreement and Subscriber Services Agreement, its suit is predicated on an independent legal duty.  (Id.)  Defendants counter that "Plaintiff's state law claims for alleged underpayments are really disguised claims which implicate coverage determinations."  (Resp. at 3.)  Also relying on Lone Star, Defendants argue that "where the [plaintiff] provider's claim puts a coverage determination into issue, ERISA is implicated" and thus Plaintiff's claims are preempted.  (Id. at 10.) Defendants are correct.

Lone Star held that when a plaintiff's state-law claims assert causes of action for violations of an independent provider agreement, the claims do not fall within the purview of § 502(a)'s enforcement provision and are therefore not preempted.  579 F.3d at 530.  There, Lone Star OB/GYN had entered into a contract ("Provider Agreement") with Aetna Healthcare to become a "Participating Provider" for individuals enrolled in Aetna-administered insurance plans, thereby entitling Lone Star to inclusion in physician directories that Aetna sends to its members.  Id. at 528.  Lone Star later sued Aetna in Texas state court under the Texas Prompt Pay Act ("TPPA"), alleging that Aetna had not paid Lone Star's payment claims at the rates set out in the Provider Agreement and within the time period required by the TPPA.  Id.  Aetna removed the case to federal court on the basis that Lone Star's state-law claims were completely preempted by ERISA.  Id.

In district court, Lone Star filed a motion to remand the action back to state court.  Id.  In opposition to Lone Star's motion, Aetna argued that the payment claims were preempted by ERISA because coverage was denied.  Id.  Lone Star then sought leave to amend its pleading to remove the claims that Aetna denied coverage.  Id.  All payment claims that Aetna had partially paid remained.  Id.  The district court then granted Lone Star's motion for leave to amend its complaint and remanded the action to state court.  Id.

On appeal, Aetna argued that Lone Star's state-law claims for partial payment sought to recover benefits due to Lone Star under the terms of their patients' Member Plans and were thus preempted by ERISA.  Id. at 529.  Lone Star responded by arguing that their state-law claims arose solely from the Provider Agreement, as Aetna failed to pay the correct contractual rate for services rendered to patients who were members of Aetna plans.  Id.  To resolve Aetna's and Lone Star's arguments, the court turned to Davila's second prong and determined that the ERISA preemption question is based on "whether the Provider Agreement create[d] a legal duty 'independent' of the ERISA plan—in this case, a duty to pay a specific contractual rate for services rendered under the ERISA plan."  Id. at 530.

The court distinguished between "right of payment" claims, which are preempted by ERISA, and "rate of payment" claims, which are not preempted.  Id. at 530–31.  A claim is a "right of payment" claim, and thus preempted by ERISA,

if it entails the determination of whether a particular medical service is covered under a benefit plan.  Id. at 530; see also Keith L. Markey, M.D., P.A. v. Aetna Health Inc., SA-11-CA-1075-XR, 2012 WL 695662, at *3 (W.D. Tex. Feb. 29, 2012) (holding that a "right of payment" claim warranting federal question jurisdiction "turn[s] on whether at least one of [the] plaintiff's claims involves a coverage determination").  A claim is a "rate of payment" claim, on the other hand, when "a medical service is determined to be covered and the only remaining issue is the proper contractual rate of payment."  Lone Star, 579 F.3d at 532.[4]  The court concluded that if Lone Star's claims implicated the rate of payment as set out in the Provider Agreement, as opposed to a right to payment as set out in the ERISA plan, then remand to state court is appropriate because the claims are not preempted by ERISA.  Id. at 531 (citing Blue Cross v. Anesthesia Care Assocs. Med. Group, Inc., 187 F.3d 1045, 1051 (9th Cir. 1999)).

However, the court ultimately remanded the action to the district court because the record did not reveal "whether the disputed payment claims were

---

[4] A partially paid claim does not necessarily constitute a "rate of payment" claim. Id. at 533.  Rather, a court must look to the claim's constituent medical procedures to determine the nature of a claim.  If the claim consists of a single medical procedure, then partial payment may indeed suggest an error in the contractual rate of payment and, as a result, the claim would not be preempted by ERISA.  Id. However, if the partially paid claim "encapsulates multiple procedures only some of which were covered, and partial payment thus resulted from a denial of benefits under the plan, the claim may be preempted."  Id.

partially paid because Aetna denied the service for lack of coverage under the plan, or because Aetna misinterpreted the Provider Agreement or made a mistake in referring to the proper fee schedule," the former requiring ERISA preemption and the latter two warranting remand to state court.  Id. at 532.

Seizing upon Lone Star's "rate of payment" versus "right of payment" distinction, Plaintiff now contends that it has only asserted state-law claims arising out of breaches of the parties' Preferred Provider Agreement and Subscriber Services Agreement, which raises an independent legal duty, because it is challenging the "amount" paid by Defendants.  (Mot. at 7.)  In other words, Plaintiff argues that its breach-of-contract claims only implicate a "rate of payment" dispute.  (Id.)  According to Plaintiff, "[t]here is no need to resort to any of the alleged ERISA plans identified by Defendants to resolve this dispute" because "[t]here is no dispute that each of the patients was fully covered under the PPO agreement."  (Id.)

However, Plaintiff's arguments that only the "amount" or "rate of payment" is at the heart of their dispute overlooks its claim for alleged underpayment for Patient #2 and misunderstands Lone Star's classification of claims that fall within ERISA preemption.  To illustrate, in its state-court Petition, Plaintiff sought a "past due balance still owed on the claim" for services rendered to Patient #2.  (Pet. at 16; see also id. ¶ 52 ("[T]he Hospital seeks the recovery of

all monies still owed on the claim for treating Patient #2 . . . .").)  Defendants

denied paying the full amount of the claim for Plaintiff's services to Patient #2

because "the charge billed by Plaintiff as an out-of-network provider exceeded the

Maximum Allowable Fee ('MAF') under Patient #2's [ERISA] Plan [with

Defendants]."  (Resp. at 10.)  According to Defendants, "Patient #2's Plan states

that '[b]enefits are payable only if services are considered to be a covered

expense . . . . [t]he benefit payable for covered expenses will not exceed the

maximum allowable fee(s).'"  (Id. (quoting Dkt. # 10, Ex. G at 156))  Defendants

claim that "Plaintiff's claim for health plan benefits relating to Patient #2 does not

merely implicate the rate of payment owed under an alleged Provider Agreement;

instead, whether the Humana Defendants breached an alleged contract with

Plaintiff (or Patient #2) depends entirely on whether the charges Plaintiff seeks

were covered under [Patient #2's] [ERISA] El Centro Del Barrio Plan."  (Id. at

11.)[5]  As such, Plaintiff's claim for the past-due balance on behalf of Patient #2 is

_____

[5] At any rate, it is curious that Plaintiff alleges only the "rate of payment" is at
issue in its claim for Patient #2.  Unlike in Lone Star, where the rates of payment
specified in the provider agreement allowed for three different options, the
agreements in the instant case, namely the Preferred Provider Agreement (signed
by Plaintiff and Three Rivers) and the Subscriber Services Agreement (entered into
by Defendants and Three Rivers), straightforwardly indicate that Defendants are
entitled to only a twenty percent discount on Plaintiff's usual charge for covered
services and therefore must pay eighty percent of Plaintiff's claim.  (Pet. ¶¶ 19–
20.)  The fact that Plaintiff submitted a claim on behalf of Patient #2 for

not solely predicated on the rate of payment; it implicates whether there was a right of payment based on Patient #2's ERISA plan.

Contrary to Plaintiff's reading of <u>Lone Star</u>, the Fifth Circuit made clear that while claims for underpayment pursuant to a provider agreement are not preempted, those claims that "implicate coverage determinations under the terms of the relevant plan" are preempted by ERISA. <u>Lone Star</u>, 579 F.3d at 532; <u>see also</u> <u>id.</u> at 531 ("Aetna is correct that any determination of benefits under the terms of a plan—i.e., what is 'medically necessary' or a 'Covered Service'—does fall within ERISA . . . ."). Because Plaintiff's claim for Patient #2 involves an uncovered expense under Patient #2's Plan, Plaintiff's claim implicates coverage determinations under an ERISA plan and is therefore preempted by ERISA. <u>See</u> <u>id.</u> at 532 (holding that if a plaintiff's claim "implicate[s] a coverage determination under the plan," the claim raises a "federal issue under ERISA"); <u>Ambulatory Infusion</u>, 2006 WL 1663752, at *8 ("Because the dispute is not 'the applicable <u>rate</u> of payment, . . . but rather 'whether the <u>services</u> themselves were . . . otherwise covered under the [ERISA] Plan,' the claim is dependent on the Plan and completely preempted by ERISA." (quoting <u>Tenet Healthsystem Hosps., Inc. v. Crosby Tugs, Inc.</u>, No. Civ. A. 04-1632, 2005 WL 1038072, at *3 (E.D. La. Apr.

---

$395,791.26 and Defendants only paid $66,369.39 should have raised concerns that the issue did not involve a simple twenty-percent arithmetic error.

27, 2005))); see also Marin, 581 F.3d at 950 (holding that when a plaintiff's state-law claim is "based on an obligation under an ERISA plan," it is not based on an independent legal duty and is therefore preempted).

In sum, because Plaintiff "could have brought [its] claim under § 502(a)" and Plaintiff's claim for Patient #2 implicates ERISA coverage determinations, Plaintiff's action is completely preempted by § 502(a). Davila, 42 U.S. at 210. Consequently, although Plaintiff pled his claim under state law, the claim is "necessarily federal in character" and this Court has jurisdiction.

As for the remaining claims, where removal jurisdiction exists over a completely preempted claim, the district court has jurisdiction over any claims joined with the preempted claim. Giles, 172 F.3d at 337. Therefore, the Court exercises jurisdiction over Plaintiff's non-preempted state-law claims.

II.   Timeliness

Plaintiff also argues that Defendants' removal was untimely. (Mot. at 2–3.) A defendant must remove an action within thirty days of receiving the initial pleading setting forth the claim for relief. 28 U.S.C. § 1446(b). If the case stated by the initial pleading is not removable, a defendant may remove the case within thirty days of receiving "an amended pleading, motion, order or other paper from which it may first be ascertained that the case is . . . removable." Id. To start the thirty-day time limit running, the information supporting removal must be

"unequivocally clear and certain."  <u>Bosky v. Kroger Tex., LP</u>, 288 F.3d 208, 211 (5th Cir. 2002).

Here, neither party necessarily disputes that Plaintiff's original Petition was not removable.  Since the Petition included only a broad allegation that Defendants violated certain provisions of the Texas Insurance Code and breached the Preferred Provider Agreement and Subscriber Services Agreement, it contained no information regarding the particular claims at issue in the case.  (<u>See</u> Resp. at 4 ("Plaintiff did not attach any claims information to its original petition, did not provide the identity of the Patients at issue, and further did not disclose that the health plan benefits it is seeking from the Humana Defendants arose from ERISA plans.").)  Defendant had no way of ascertaining whether any of the individual claims were in fact preempted by ERISA.  Thus, the thirty-day time limit did not begin to run on September 23, 2013 when Defendant was served with the Petition.

However, as discussed <u>supra</u>, a federal question did arise when Plaintiff sent Defendant the spreadsheets detailing the specific claims at issue in the case on November 1, 2013.  (<u>See</u> "Aujla Decl.," Resp. Ex. C (stating that Plaintiff's counsel provided the names of the four patients at issue with a spreadsheet of claims information on Friday, November 1, 2013).)  Since the claim details in the spreadsheets showed that at least one of the medical claims in the

case involved a coverage determination, (see Claim Spreadsheet for Patient #2, Dkt. # 1, Ex. G-7 at 7), only then did the spreadsheets made it "unequivocally clear and certain" that a federal question existed.  Thus, upon receipt of the spreadsheets on November 1, 2013, Defendant was notified for the first time that the case was removable and the thirty-day time limit began to run.  Because Defendant filed its notice of removal within the thirty-day time limit on December 2, 2011, removal was timely.

<u>CONCLUSION</u>

Based on the foregoing analysis, the Court **DENIES** Plaintiff's Motion to Remand (Dkt. # 6).

IT IS SO ORDERED.

DATED: San Antonio, Texas, June 11, 2014.

_____

David Alan Ezra
Senior United States Distict Judge